**John FITTANTO and Teresa Fittanto, individually and as parents of Sara Fittanto, a minor child, and Teresa Fittanto, as mother and next friend of Marie Lodge, a minor, Plaintiffs,**

v.

**CHILDREN'S ADVOCACY CENTER, an Illinois not-for-profit corporation, et al., Defendants.**

No. 91 C 6934.

United States District Court, N.D. Illinois, E.D.

Sept. 24, 1993.

---

James D. Montgomery, Jean M. Templeton, James D. Montgomery & Associates, Ltd., Chicago, IL, for plaintiffs.

Vincent C. Cipolla, William W. Kurnik, Kurnik, Cipolla, Stephenson & Barasha, Arlington Heights, IL, for defendant Pamela Klein.

Charles L. Lowder, Mary Kay Scott, Robert P. Vogt, Bullaro, Carton & Stone, Chicago, IL, for defendants Children's Advocacy Center and Tp. of Hanover.

Timothy Harold Okal, John D. Spina, Anthony F. Spina, James T. McGuire, Spina, McGuire & Okal, Elmwood Park, IL, Charles L. Lowder, Mary Kay Scott, Robert P. Vogt, Bullaro, Carton & Stone, Chicago, IL, for defendant Hanover Tp. Mental Health Bd.

Keri–Lyn Joy Krafthefer, Michael Ray Gibson, Cynthia Ann Freburg, Odelson & Sterk, Ltd., Evergreen Park, IL, Charles E. Hervas, James Gus Sotos, Michael William Condon, Michael D. Bersani, Hervas, Sotos & Condon, Itasca, IL, for defendants Village of Hanover Park and Jorge L. Martinez.

Mary Patricia Needham, Illinois Atty. Gen.'s Office, Chicago, IL, for defendant Al Ragland.

Marita Clare Sullivan, Mary Patricia Needham, Illinois Atty. Gen.'s Office, Chicago, IL, for defendant Eunice Smith.

Marita Clare Sullivan, Mary Ellen Coghlan, Mary Patricia Needham, Paul Francis Carlson, Illinois Atty. Gen.'s Office, Chicago, IL, for defendant Wayne Fieroh.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

This case involves allegations of child sexual abuse which led to the arrest of plaintiff, John Fittanto, and to the protective custody of his two children for over a year. When the children were ordered returned to the

Fittantos and the charges of sexual assault dropped, the Fittantos sued various municipal agencies and individuals alleging constitutional deprivations under 42 U.S.C. § 1983 and malicious prosecution under state law. On March 17, 1992, defendants Klein, Ragland and Smith were dismissed on grounds of qualified immunity. Before the court are motions for summary judgment by the remaining defendants, the Children's Advocacy Center ("Center"), Hanover Township and Hanover Mental Health Board (collectively the "CAC defendants"); the Village of Hanover Park ("Village"); Jorge L. Martinez, a police officer for the Village, and Sgt. Wayne Fieroh of the Illinois State Police.

### *SUMMARY JUDGMENT STANDARD*

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir.1989); *Oxman v. WLS–TV*, 846 F.2d 448, 452 (7th Cir.1988); *Jakubiec v. Cities Service Co.*, 844 F.2d 470, 471 (7th Cir.1988). Summary judgment will be denied where there is a genuine issue of material fact such that a reasonable jury could find for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Jakubiec*, 844 F.2d at 473. The movant need not, however, provide affidavits or deposition testimony. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The nonmovant must make a showing sufficient to establish any essential element for which he will bear the burden of proof at trial. *Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552. Also, it is not sufficient for the nonmovant to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. *See Covalt v. Carey Canada, Inc.*, 950 F.2d 481, 485 (7th Cir.1991); *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 476–77 (7th Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988). If the evidence presented by the nonmovant is merely "colorable,"

summary judgment is appropriate. *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989). As the Seventh Circuit has summarized:

> The moving party bears the initial burden of directing the district court to the determinative issues and the available evidence that pertains to each. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 [106 S.Ct. 2548, 2553, 91 L.Ed.2d 265] (1986); *id.* at 325 [106 S.Ct. at 2554] ("the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case"). Then, with respect to issues that the nonmoving party will bear the burden of proving at trial, the nonmoving party must come forward with affidavits, depositions, answers to interrogatories or admissions and designate specific facts which establish that there is a genuine issue for trial. *Id.* at 324 [106 S.Ct. at 2553]. The nonmoving party cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue. *Id.* The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 [106 S.Ct. 1348, 1356, 89 L.Ed.2d 538] (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 [106 S.Ct. 2505, 2512, 91 L.Ed.2d 202] (1986).

*Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992).

### FACTS

On Monday, October 16, 1989, Kristina Lopez became upset at school and was taken to the principal's office, where, after various complaints about her next door neighbor, Marie Fittanto, as well as the dog in the Fittanto's house, Kristina said Marie's father was "bad" because he "touched her privates." [1] The alleged touching occurred over her clothing and, apparently, during the preceding weekend. School authorities attempted reporting the matter to the Department of Child and Family Services ("DCFS"), which declined the report. Mrs. Lopez was contacted and referred to the local police.

The Village of Hanover Park Police Department arranged for an interview to be conducted at the Center. Detective Martinez of the Village police and Sandy Trumpinski, a social worker at the Center, were present during the initial interview. Kristina claimed that John Fittanto had brought her into the bathroom and "touched her privates" over her clothing. Kristina also used anatomically correct dolls to demonstrate how John touched her over her underpants. Kristina alleged that after John touched her, Kristina told her friend Marie, who responded that John does the same thing to her.

At the conclusion of this October 16, 1989 interview, the Lopez family was referred by Martinez to Glen Oaks Medical Center for an examination of Kristina. Although medical personnel at Glen Oaks requested permission to conduct an internal examination using the sexual assault kit provided by the State, Mrs. Lopez would allow only a superficial examination. The Glen Oaks examination found no physical evidence of abuse. At this point, Martinez did not believe he had probable cause to arrest anyone.

On October 19, 1989, Kristina was again interviewed at the Center. Pamela Klein, director of the Center, scheduled the interview. Both Klein and Trumpinski performed the interview with Kristina. The interview was monitored by Martinez, Sgt. Dan Driscoll of the Village police, Assistant State's Attorney Joel Block and Illinois State Police Officer Wayne Fieroh. Klein arranged Fieroh's attendance because Klein had a low opinion of Martinez's abilities. Driscoll did not feel Fieroh's presence was necessary because the case involved only allegations of fondling. In this interview, Kristina again alleged that John had touched her private parts while in the bathroom of the Fittanto home.

Klein directed the questioning at the October 19 session, steering the child's attention from topic to topic. After the interview, Martinez was skeptical of Kristina's allegations. Kristina did not exhibit any emotion during this interview. At the conclusion of the interview, Block indicated that he could not approve charges. Klein lashed-out in a verbal outburst, calling Block an "asshole." Klein scheduled another interview for October 24.

On October 24, Kristina again reported that she had been abused by John. She also disclosed, for the first time, that John had forced her to perform oral sex, demonstrating his acts with the dolls. Kristina's allegations on this date, however, seemed to Martinez to be "nonsensical" and some seemed "strange." For example, Kristina also reported that John poked himself with scissors, she spoke of the presence of blood and of other men who videotaped her, dog feces in the bathtub which John wanted to put on her, that the dog urinated on her, that various diagrams were drawn, that she was called a "bitch," that John put a gold knife on her head, that John would marry her when she grew up, that she was forced to drink wine, that John touched her in various places, that John "had his privates in her privates," that John waved a magic wand at her, and that John drew on his wife, Teresa, with blood. At the conclusion of this interview, Martinez did not believe there was sufficient evidence to arrest John Fittanto.

A medical examination was scheduled for Kristina at Mt. Sinai Hospital on October 25, 1989, to evaluate both sexual and ritualistic abuse. Dr. Aguila performed a modified

---

1. All disputed facts and the inferences to be drawn therefrom have been construed in favor of plaintiffs.

genital examination which included an examination of the vaginal area and the rectum. The only medical finding was "perihymenal trauma," a red discoloration in the hymenal region which led Dr. Aguila to report that she "could not rule out fondling." She also could not rule out ill-fitting clothes, detergents or self-stimulation as a cause.

Kristina was also interviewed again on October 25. This interview was the first interview attended by DCFS officials, but was terminated by the Assistant State's Attorney when Kristina was too tired to pay attention. There is no police report of this interview. In attendance at this interview were Driscoll, Martinez, Assistant State's Attorney Bruce Lester and Al Ragland from DCFS. Assistant State's Attorney Lester was instructed to go to the Center by his supervisor because an interview was being conducted regarding a possible sexual abuse/assault and his services were needed to evaluate the evidence gathered by the police.

Kristina was brought back to the Center on October 27th and interviewed by Klein. In attendance were Driscoll, Martinez, Lester and Fieroh. Kristina again alleged that John had taken her into the bathroom and "touched her privates" through her clothing and reiterated many of the allegations Martinez had found to be strange and nonsensical during the interview on October 24th. Klein interpreted some of these allegations to have satanic overtones.

There is a dispute over how and why charges against John Fittanto were ultimately approved. Martinez has testified that he did not recall any conversation with Mt. Sinai on the 27th, but that he was told by Klein and others that Kristina suffered from a sexually transmitted disease. As a result, Martinez so testified before the Grand Jury. Lester has testified that he found Kristina's testimony to be "clear and convincing" with respect to the two incidents that were being alleged against John Fittanto. Plaintiffs dispute whether or not Lester actually believed

this. Driscoll has testified that Lester "was not impressed" after the October 27 interview. After Lester expressed this to Klein, Klein started a volatile exchange with Lester in efforts to get him to change his mind. Klein insisted felony charges be approved. Fieroh also expressed his view that charges should be approved. Driscoll then took Lester from the room. Driscoll advised Lester that there had been previous credible interviews and that there had been a positive report of a sexually transmitted disease from Mt. Sinai. Following this discussion, Lester sought and obtained approval from his supervisors for charges. Driscoll believes the charges were based upon Kristina's interview statements and the report of a sexually transmitted disease. Driscoll had learned of the sexually transmitted disease from someone at the Center. Lester later testified that he did not recall any mention of a sexually transmitted disease and that it did not play any role in his decision to seek charges. Lester testified that Kristina's testimony and medical evidence of the perihymenal trauma [2] formed the basis of his decision to pursue charges. The parties dispute whether Lester had any medical information prior to seeking charges against John Fittanto. Martinez thought the evidence was "weak" and did not believe there was probable cause to arrest John Fittanto.[3]

Lester instructed Driscoll and Martinez as to what charges should be prepared. Per Lester's instructions, Driscoll prepared the charges and typed the complaint. Martinez and Driscoll then went to the Rolling Meadows Courthouse on October 27, 1989 to obtain an arrest warrant for John Fittanto. After explaining to Judge Zagone that Kristina had made allegations regarding a touching and of oral sex, Judge Zagone approved the issuance of a warrant for John's arrest.

On October 30, 1989, Martinez and Fieroh arrested John Fittanto on the warrant, while he was at work. That same day, a consensual search of the Fittanto home produced no

---

**2.** Martinez has testified, contrary to Driscoll and Lester, that the findings from Mt. Sinai did not become available until after John's arrest.

**3.** Plaintiffs argue that a reasonable jury could conclude that Martinez and Driscoll learned of the sexually transmitted disease information from Klein, i.e., that she lied to them in efforts to obtain charges against John Fittanto.

incriminating evidence. On November 16, 1989, a Cook County Grand Jury indicted John Fittanto for the offenses of aggravated criminal sexual assault and aggravated sexual abuse. The only witness to testify before the Grand Jury was Martinez. At the hearing, Martinez testified regarding sexual activity and a sexually transmitted disease based on information told to him by Klein and others at the Center. He was not aware that the report from Mt. Sinai was negative for sexually transmitted disease. According to Dr. Aguila, those tests were ordered on October 25, 1989. The results were first available November 16, 1989.

On October 31, 1989, Ragland from DCFS made the decision that Marie Lodge, Teresa Fittanto's daughter from a prior marriage and John Fittanto's stepdaughter, was at risk and obtained an order taking temporary custody of Marie. Ragland's only investigation was his appearance at Kristina's October 25, 1989 interview and his decision to take protective custody was based solely on the police investigation by the Village, John Fittanto's arrest and his subsequent release on bond.

On July 10, 1990, the Fittantos had a child, Sara, who was also seized by DCFS. Custody of Sara was granted to Teresa Fittanto's parents and Teresa was granted visitation.

The Center was created in 1988 and is funded by Hanover Township under the responsibility of the Hanover Township Mental Health Board. Hanover Township serves the three-village area including the Villages of Bartlett, Streamwood and Hanover Park. The Center is authorized by state statute and may "coordinate the activities of the various agencies involved in the investigation, prosecution and treatment referral of child sexual abuse." 55 ILCS 80/1,4 (1993). The Center is a not-for-profit corporation incorporated under the laws of Illinois. Hanover Township Mental Health Board is an agency of Hanover Township and is charged with the direction and supervision of the Center's operations. The Center was created by Hanover Township to provide a place in which children's interviews could be conducted in a "homelike" environment, as untraumatic as possible. The Center was also designed to assess, investigate and treat cases of child abuse and to provide a neutral location where the various law enforcement disciplines, including the State's Attorney's Office, DCFS, and police departments, could all observe the interview of the child at the same time.

Plaintiffs' four-count complaint alleges unreasonable search and seizure by the individual defendants (Count I), violations of plaintiffs' constitutional right to associate by the individual defendants (Count II), deliberate indifference to plaintiffs' constitutional rights on the part of all defendants and a failure to train by all municipal defendants (Count III—official capacity claims) and malicious prosecution by individual defendants (Count IV).

### MARTINEZ'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs' claims against Martinez allege unreasonable search and seizure of John Fittanto (false arrest) and of Sara Fittanto and Marie Lodge (protective custody) (Count I), interference with plaintiffs' right to associate as a family (Count II), reckless indifference to the truth in violation of plaintiffs' rights (Count III) and malicious prosecution (Count IV). Martinez argues that probable cause existed to arrest John Fittanto, barring the claims involving John Fittanto's arrest. Martinez further argues that he is entitled to qualified immunity and that there is no causal connection between his investigative activities and the seizure of Marie Lodge and Sara Fittanto.[4]

Government officials, including police officers, are qualifiedly immune, and thus shielded from liability,[5] for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights

---

4. Martinez did not join in the previous motion to dismiss.

5. Qualified immunity shields defendants in their individual capacities only. *Knox v. McGinnis*, 998 F.2d 1405, 1412 (7th Cir.1993); *Akins v.*

*Board of Governors of State Colleges & Universities*, 840 F.2d 1371, 1375–76, vacated, 488 U.S. 920, 109 S.Ct. 299, 102 L.Ed.2d 319 *on remand*, 867 F.2d 972 (7th Cir.1988) (reinstating original opinion as to named plaintiff); *Hadi v. Horn*, 830 F.2d 779, 782–83 (7th Cir.1987).

of which a reasonable person would have been aware. *McDonnell v. Cournia*, 990 F.2d 963, 968 (7th Cir.1993) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982)). *See also Anderson v. Creighton*, 483 U.S. 635, (1987); *Rakovich v. Wade*, 850 F.2d 1180, 1201–10 (7th Cir.1988) (en banc). Determining whether an official's conduct violates clearly established constitutional rights involves a two-step inquiry. *Cournia*, 990 F.2d at 968. "First, the *plaintiff* must show that the law was clearly established when the challenged conduct occurred. In this Circuit, we ask 'whether the law was clear in relation to the specific facts confronting the public official when he or she acted.'" *Id.* (quoting *Apostol v. Landau*, 957 F.2d 339, 341 (7th Cir.1992) (emphasis added)). "Second, we evaluate the objective legal reasonableness of the defendants' conduct. We inquire whether reasonably competent officials would agree on the application of the clearly established right to a given set of facts." *Id.; see also Henderson v. DeRobertis*, 940 F.2d 1055, 1059 (7th Cir.1991).

■ What is at issue in this motion is the second prong of the constitutional analysis; the objective legal reasonableness of Martinez's actions. *Cournia*, 990 F.2d at 968. As the United States Supreme Court has explained, this second prong is not satisfied if "a reasonable officer could have believed [his action] to be lawful, in light of clearly established law and the information the arresting officer[ ] possessed." *Hunter v. Bryant*, —— U.S. ——, ——, 112 S.Ct. 534, 536, 116

L.Ed.2d 589 (1991); *Cournia*, 990 F.2d at 968.

This balance favors the movant, *Ellis v. Wynalda*, 999 F.2d 243 (7th Cir.1993). Once the defense of qualified immunity has been raised, plaintiffs have the burden to point out a closely analogous case establishing the particularized right under the circumstances of the case. *Rice v. Burks*, 999 F.2d 1172 (7th Cir.1993); *Cornfield v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1324 (7th Cir.1993).[6] *But see Hannon v. Turnage*, 892 F.2d 653, 657 (7th Cir.1990) (since qualified immunity determinations will often be made before substantial discovery, plaintiffs should not routinely be required to come forward with evidence contradicting the defendant's facts supporting qualified immunity).

"The words 'clearly established ... constitutional rights' may not be used to read the defense of immunity out of federal tort law by the facile expedient of stating constitutional rights in the most general possible terms.... The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful." *Rice*, 999 F.2d at 1174 (quoting *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987)).

Not only do plaintiffs cite no analogous cases establishing a particularized right, their memorandum fails to argue with any clarity the particularized right allegedly violated.[7] The issues in this case are not so novel or unique that no relevant law exists.

---

**6.** In *Cornfield*, the Seventh Circuit seemed to collapse the two-prong analysis it announced in *Cournia*. 991 F.2d at 1323–24. *Cornfield* involved the nonconsensual strip search of a student suspected of concealing drugs in his pants. In addressing defendants' qualified immunity argument, the Seventh Circuit articulated the standard as one protecting officials for all but violations of clearly established statutory or constitutional rights. *Cornfield*, 991 F.2d at 1323. The contours of that right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Id.* at 1324. The law must be clear in relation to the specific facts and it is the plaintiff who bears the burden of establishing the particularized right. *Id.* By contrast, the court in *Cournia* first articulated the general legal principle applicable to the facts, *i.e.*, the right to be free from arrest without

probable cause. 990 F.2d at 968. It was in the second prong, analyzing the objective legal reasonableness of the actions, where the court both took account of the specific facts of the case and assessed the right in light of those facts. *Id.* Either process, however, applied the same standard and burdens.

**7.** Plaintiffs cite only *Myers v. Morris*, 810 F.2d 1437 (8th Cir.1987) and *Snell v. Tunnell*, 920 F.2d 673 (10th Cir.1990) in general support of their motion. *Myers* and *Snell* were both cited in this court's March 17, 1992 opinion. *Fittanto v. Klein*, 788 F.Supp. 1451, 1458 (N.D.Ill.1992). In that opinion, this court noted that *Myers* showed that there was no clearly established norm for the investigation of child abuse allegations. 810 F.2d at 1461. That opinion also pointed out that *Snell* involved claims of deliberate fabrication of

*See e.g., Dees v. City of Miami,* 747 F.Supp. 679 (S.D.Fla.1990). In *Dees,* plaintiff alleged that intense public pressure on the police department to find someone responsible for a shooting caused police to arrest plaintiff without probable cause, on the basis of false evidence, obtained with reckless disregard for the truth. *Id.* at 683–84. The *Dees* court granted summary judgement to the defendant investigative officers on qualified immunity grounds. *Id.* at 686. The court rejected plaintiffs' arguments going to the subjective intentions of the officers to elicit false witness statements. *Id.* at 685. The *Dees* court also granted summary judgement in favor of the municipal defendants because plaintiff failed to show any other instances evidencing a policy of intentionally creating and using false evidence and also failed to establish evidence of a failure to train in deliberate indifference to plaintiff's constitutional or statutory rights. *Id.* at 688–90. In this case, plaintiffs' failure to cite relevant legal authority leaves the district court to flesh-out the issues and the legal authority. The failure to point to any closely analogous case would justify summary judgment on the § 1983 claims in favor of individual defendants on qualified immunity grounds. *See Rice,* 999 F.2d at 1174. Plaintiffs' arguments will nonetheless be addressed.

Plaintiffs correctly note that for purposes of qualified immunity, the relevant issue is whether Martinez's "behavior" was "objectively reasonable." Plaintiffs then go on to note that Kristina exhibited "none of the typical post-traumatic symptoms usually seen in children who have been sexually abused" and that Martinez "had doubts about whether there was sufficient evidence to proceed" after the October 27, 1989 interview. Martinez was aware, plaintiffs note, of the negative medical report from Glen Oaks Hospital, "yet never bothered to verify or confirm what the *results* from Mt. Sinai were." (Emphasis added.) It is not clear from plaintiffs' argument whether by "results," they are referring to the finding of perihymenal trauma or the finding that no sexually transmitted disease was discovered. Plaintiffs finally

note that "[d]espite this lack of corroborating evidence, [Martinez] participated in an investigation that was clearly unreasonable and apparently did nothing to express his own opinion about the lack of probable cause. In fact, [plaintiffs argue] Martinez did not believe there was probable cause for [John] Fittanto's arrest, so his actions in participating in the arrest are not objectively reasonable." Pls.' Mem. at 15. For purposes of qualified immunity, Martinez's subjective conclusions with respect to the credibility of Kristina's allegations are irrelevant. *See Davis v. Owens,* 973 F.2d 574, 576–77 (7th Cir.1992); *Polenz v. Parrott,* 883 F.2d 551, 554 (7th Cir.1989). What is relevant is whether a reasonable officer in Martinez's position could have regarded Kristina's allegations of fondling as sufficient to believe a crime had been committed.[8]

Plaintiffs simply lump together what they consider to be unreasonable behavior on Martinez's part and assert that "this behavior" is unreasonable and, to liberally construe plaintiffs' argument, is clearly violative of plaintiffs' statutory or constitutional rights. As noted in the March 17, 1992 opinion, 788 F.Supp. 1451 (N.D.Ill.), there is no case clearly establishing how children must be interviewed in investigating child abuse. *Id.* at 1457–59; *see Myers v. Morris,* 810 F.2d 1437, 1461 (8th Cir.1987). Also, as stated in that opinion, plaintiffs make no allegation that Martinez knew that Kristina's allegations of sexual abuse were false; merely that Martinez had his doubts. *Cf. Snell v. Tunnell,* 920 F.2d 673, 698 (10th Cir.1990) (child care workers knew that allegations of child prostitution and pornography were fabricated). *See also Davis v. Owens,* 973 F.2d 574, 576–77 (7th Cir.1992) (inefficient police work is not a constitutional violation and police need not uncover every piece of exculpatory evidence during an investigation). Plaintiffs cite to no analogous cases showing that any of Martinez's specific acts related to the *investigation* violated plaintiffs' clearly established constitutional rights.

evidence by those seeking custody and that plaintiffs in this case make no such allegations.

8. Also relevant are the facts that Lester approved the charges against Fittanto and that Judge Zagone issued the arrest warrant.

Judge Zagone issued an arrest warrant for John Fittanto. Police officers may generally rely on the existence of a facially valid arrest warrant as support for probable cause. *Juriss v. McGowan*, 957 F.2d 345, 350 (7th Cir. 1992); *Lowrance v. Pflueger*, 878 F.2d 1014 (7th Cir.1989). An exception to the facially valid warrant defense exists where the officer responsible for obtaining the warrant knows there is no probable cause or where he knows those who obtained the warrant deceived the authorizing body. *Juriss*, 957 F.2d at 350. Plaintiffs have not argued that Martinez recklessly disregarded the truth by omitting material exculpatory evidence in applying for the warrant in front of Judge Zagone. For such an argument, the plaintiff must make a substantial showing of deliberate falsehood or reckless disregard for the truth to challenge the presumed validity of the warrant. *See Stewart v. Donges*, 915 F.2d 572, 581 (10th Cir.1990) (quoting *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). Plaintiffs fail to make any showing that what was presented to Judge Zagone was deliberately false or that recklessly omitted material evidence would have prevented the warrant from issuing. *Cf. Stewart*, 915 F.2d at 581–83. A reasonable officer, although questioning the veracity of Kristina's allegations, could nonetheless reasonably believe that probable cause existed to arrest John Fittanto because Lester had approved the charges and Judge Zagone had found in Kristina's allegations sufficient probable cause to issue an arrest warrant. Therefore, Martinez is entitled to qualified immunity with respect to the § 1983 claims made against him in his individual capacity.

### CAC DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

■ The basis of plaintiffs' § 1983 claim against the CAC defendants is that they hired a director for the Center, Klein, with "plainly insufficient qualifications," that they delegated to her the "responsibility of making *determinations* with respect to charges of sexual abuse," (emphasis added) and that the director and staff were not properly trained. The CAC defendants respond that Klein's qualifications to work at the Center are in no way "plainly insufficient," that the CAC defendants did not delegate to Klein the responsibility for making determinations regarding sexual abuse, and that there is no evidence to show that the CAC defendants' alleged failure to train Klein amounted to deliberate indifference. Additionally, the CAC defendants argue that nothing the CAC defendants did or failed to do proximately caused the plaintiffs' alleged injury because it was Lester who made the determination to have John arrested.

Plaintiffs' claims against the CAC defendants must be based upon some policy or custom. *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). Where a non-policymaking official[9] commits a constitutional violation and no policy or custom caused the violation, a plaintiff may nonetheless maintain an action if a "failure to train" the official caused that violation. *See Graham v. Sauk Prairie Police Com'n*, 915 F.2d 1085, 1099 (7th Cir.1990). However, the failure to train must amount to "deliberate indifference" to the rights of persons with whom those officials come into contact. *Id.* at 1100; *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989).

The CAC defendants argue there is no evidence that their failure to train Klein amounted to deliberate indifference. In an effort to establish a genuine issue of fact, plaintiffs point to what they consider to be misstatements and overstatements in Klein's curriculum vitae (CV) and the fact that the CAC defendants never verified any of Klein's qualifications. Pls.' Mem. at 17–18. Again, plaintiffs cite no legal authority for the proposition that the failure to verify qualifications prior to hiring Klein amounts to deliberate indifference to plaintiffs' constitutional or statutory rights and plaintiffs point to no "training" which would have been appropriate given Klein's professed experience.

---

9. Plaintiffs do not argue that Klein was a policymaking official of any of the CAC defendants. *McGee v. Bauer*, 956 F.2d 730, 733 (7th Cir.1992) (policymaker is one who possesses final authority to establish municipal policy regarding the actions taken).

In *Graham*, plaintiffs alleged that various municipalities, their police commission and the chief of police were liable under § 1983 for hiring, supervising, retaining and failing to conduct an adequate investigation into the background of an officer suffering from chronic paranoid schizophrenia who, while suffering from paranoid delusions, shot and killed a suspect for no reason. 915 F.2d at 1088. The *Graham* court considered plaintiffs' argument of failure to investigate under the deliberate indifference standard applicable to failure to train cases. The Seventh Circuit affirmed summary judgment in favor of defendants noting that "the need for more or different training [must be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *Graham*, 915 F.2d at 1101 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. at 388, 109 S.Ct. at 1204). Furthermore, it is insufficient to prove that an injury or accident could have been avoided if a municipal employee had better or more training, sufficient to equip him to avoid the particular injury-causing conduct—such a claim could be made about any encounter yet not condemn the adequacy of the training for the usual and recurring situations with which the employee must deal. *Id.* (quoting *Canton*, 489 U.S. at 390, 109 S.Ct. at 1206).

The undisputed evidence is that the Center sought a director with a master's degree and five years' experience in interviewing children, some of which involved child abuse. Klein's CV indicates that she holds a master's degree in counselling education and a bachelor's degree in sociology and psychology from Southern Illinois University. The CV also indicates Klein was the director of the Rape and Sexual Abuse Care Center at Southern Illinois University from 1977 through 1985 and that this experience included the development of an intervention program for sexually abused children. The CV lists other professional experience involving issues of child abuse, and lists professional presentations, publications and professional memberships. Klein served as the director of defendant Center from 1987 to 1989.

The Mental Health Board was responsible for funding the Center and entered into a contract with the Kenneth Young Center, a social services provider, to administer the day-to-day operation of the Center. Klein was initially contacted by the Kenneth Young Center prior to her being hired and the Mental Health Board was informed that Klein was highly qualified in the field of sexual abuse investigation based on her experience, training of seminars with State police and other public agencies. Klein was hired to conduct and coordinate the interview process at the Center. Klein's authority extended to conducting and supervising interviews, hiring additional personnel and decision making regarding how people were treated at the Center. During 1989, the Mental Health Board looked into the Kenneth Young Center's supervision of Klein and determined that it was providing adequate supervision. No complaints regarding the manner in which Klein was performing her work at the Center were received by the Mental Health Board prior to the instant case. In 1989, the Kenneth Young Center stopped supervising the Center and the Board took over supervision of the Center. Klein continued in her role as director and there was never a question as to her qualifications.

In an effort to establish deliberate indifference, plaintiffs point to the fact that Klein has disclaimed involvement in certain studies appearing on her CV as experience while in Great Britain. Also, she could not substantiate numerous items relating to her time spent in England but included on her CV. Plaintiffs also point to the fact that Klein's lectures primarily concern treatment as opposed to evaluation or investigation of child sexual abuse. Plaintiffs argue that, had the Mental Health Board discovered these defects in Klein's qualifications, they would have been placed on notice of issues pertaining to her credibility and professionalism. As was the case in *Graham*, jurors in this case could not reasonably conclude that the need for further investigation into Klein's background was so obvious and the lack of further investigation so likely to result in a *constitutional* deprivation that defendants were deliberately indifferent to plaintiffs'

constitutional rights. 915 F.2d at 1102–03; see also Stokes v. Bullins, 844 F.2d 269, 275 (5th Cir.1988) (failure to perform National Crime Information Center report during otherwise adequate investigation into background of police officer should not be used as a talisman for indifference to constitutional rights); Smith v. City of Joliet, 965 F.2d 235, 237 (7th Cir.1992) (even evidence of other instances of constitutional deprivation are not necessarily sufficient to show deliberate or conscious indifference). A reasonable jury could not conclude that the Mental Health Board's reliance on Klein's stated qualifications and the recommendation of the Kenneth Young Center amounted to deliberate indifference. Plaintiffs point to no evidence that would place the Board on notice of a need to further substantiate Klein's qualifications for the job. Cf. Graham.

■ Plaintiffs also allege that the CAC defendants delegated to Klein "the responsibility of making determinations with respect to charges of sexual abuse." Plaintiffs cite no legal authority for the proposition that such a policy violates plaintiffs' constitutional rights and take for granted that such a delegation of responsibility would violate their constitutional rights. None of the CAC defendants control either the Village police or the State's Attorney's office.

With respect to plaintiffs' claim that the CAC defendants delegated authority to Klein to make "determinations" regarding child sexual abuse, plaintiffs theorize that Klein exercised her discretion as the director of the Center to pressure the local police and the State's Attorney into proceeding with charges which were of a questionable nature and that, had she not persisted in pursuing this "investigation," it is unlikely charges would have been brought against John Fittanto. "Klein's dogged insistence that John Fittanto be arrested was the moving force behind the deprivations suffered here." Pls.' Mem. at 18. Although plaintiffs have established support for such an argument, those facts, by themselves, would not establish a policy of delegating authority to Klein. Plaintiffs' hypothesis seems to be that Klein overreached her authority by pressuring the police and State's Attorneys. Considerably

more proof than this single incident is necessary to establish fault on the part of the municipality; a connection between a policy and a constitutional deprivation must be shown. City of Oklahoma City v. Tuttle 471 U.S. 808, 824, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985); Graham, 915 F.2d at 1100. Plaintiffs have failed to come forward with any evidence of a policy or custom of delegating authority that would constitute a violation of plaintiffs' rights. Therefore, summary judgment will be granted in favor of the CAC defendants.

## FIEROH'S MOTION

■ Fieroh argues that he is entitled to qualified immunity. Plaintiffs argue that Fieroh had even less evidence to support probable cause than did Martinez. Fieroh received a phone call from Klein requesting his assistance in her investigation of a sex abuse case because it had "cult overtones." Fieroh attended only one of the interviews with Kristina. Klein apparently sought Fieroh's opinions as to "what he thought about the allegations." Pls.' Mem. at 19. Fieroh claims that he did not form an opinion as to Kristina's credibility, but rather relied on what Driscoll and Klein told him. Fieroh did, however, express his view that there was reason to believe Kristina's allegations even though he was not aware of the results of any medical examinations.

Plaintiffs argue a reasonable jury could determine that Fieroh was brought into the investigation by Klein in order to support her position that there were satanic overtones to the case and to investigate allegations of this nature. They further argue that a reasonable jury could determine that it was unreasonable for Fieroh to fail to observe the person making the allegations, fail to ascertain, first-hand, the credibility of the person making such allegations and fail to attempt to ascertain whether any of the medical examinations Kristina underwent corroborated or failed to corroborate her story. Plaintiffs do not support this argument with any analogous legal authority supporting either the argument that Fieroh's participation in the arrest violated plaintiffs' constitutional rights

or that Fieroh's involvement in the investigation amounted to such a violation.

In assisting Martinez in the arrest, Fieroh was entitled to rely on the facial validity of the arrest warrant issued by Judge Zagone. *Juriss,* 957 F.2d at 350; *see also Lowrance,* 878 F.2d at 1017. Plaintiffs have pointed to no evidence that Fieroh was placed on notice of any defect in the arrest warrant issued by Judge Zagone. *Juriss,* 957 F.2d at 350. A reasonable officer in Fieroh's position could believe there was probable cause to arrest John Fittanto. Fieroh is therefore entitled to qualified immunity for his participation in the arrest of John Fittanto.

Plaintiffs have further failed to cite any analogous cases establishing a specific right to be free from the involvement Fieroh is alleged to have had in the investigation. Plaintiffs have established no evidence that would allow a reasonable jury to conclude that he either recklessly disregarded the truth in this case or was deliberately indifferent to any of plaintiffs' rights. Therefore, summary judgment will be granted in favor of Fieroh.

### VILLAGE OF HANOVER PARK'S MOTION

■ Count Three of the complaint alleges that the Village referred the responsibility for investigation of child sexual abuse to the Center. Plaintiffs argue the referral of such investigative responsibilities makes the failure of the Village to adequately train the Center staff regarding such investigations equivalent to a deliberate disregard for plaintiffs' constitutional rights.[10] The complaint similarly alleges a policy or custom on the part of the Village to refer authority to make probable cause determinations in child sexual abuse cases to the Center staff, and to refer authority to investigate such cases to the Center staff, and a policy of failing to provide for the supervision, review or independent evaluation of investigations performed by the Center staff, and a custom whereby Village police officers fail to take steps to indepen-

dently verify allegations of child sexual abuse or to intervene in instances of "coaching" by Center staff.

The Village seeks summary judgment on the grounds that it did not have a policy of referring authority over the investigation of child abuse cases to the Center, that it adequately trained its officers, and that there was probable cause for John Fittanto's arrest. Plaintiffs attempt to show a genuine issue of material fact with respect to the policies of the Village, including referral of investigatory powers, by restating the events of this case. Although plaintiffs have introduced evidence that the skill of the interviewer at the Center would play an important role in the investigatory process, plaintiffs have presented no evidence that on any other occasion the Center staff took over the investigatory function from local police. *See Monell,* 436 U.S. at 691, 98 S.Ct. at 2036; *Graham,* 915 F.2d at 1100. Furthermore, none of the Village officers involved in this case are policymaking officials whose actions themselves could be said to constitute municipal policy. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

The Village has introduced uncontroverted evidence that the Village has a policy of maintaining responsibility for the investigation of child sexual abuse cases and of using the Center for organizing and performing interviews of the children. The Center has no authority to direct the Village or the State's Attorney conducting such investigations and it was Lester who determined, with or without the insistence of Klein, to approve charges. Plaintiffs fail to contradict such evidence with any evidence of any other instances that could be considered a practice on the part of the Village. *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036. No genuine issue of fact exists with respect to the lack of any alleged policy or custom on the part of the Village. Therefore summary judgment is appropriate in favor of the Village with respect to all but plaintiffs' claim for failure to train

---

**10.** Plaintiffs, however, fail to establish any evidence of a policy to refer investigatory responsibility to the Center. Therefore, plaintiffs' argument that the *Village* has failed to train the

Center staff need not be addressed. Plaintiffs' argument that the CAC defendants failed to adequately train the Center staff has been addressed *supra* at 1414.

the police and is also appropriate in favor of Martinez on plaintiffs' claims against him in his official capacity, *see Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) (although individual capacity claims under § 1983 only require a violation under color of state law, official capacity claims require a showing that the deprivation was the result of some policy or custom).

■ Plaintiffs allege that the Village failed to adequately train the police with respect to the investigation of child sexual abuse. A "failure to train" claim may be maintained on the basis that "the need for more or different training [is] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *Graham,* 915 F.2d at 1101; *Harris,* 489 U.S. at 388, 109 S.Ct. at 1204. As evidence of a failure to train, plaintiffs point to the following: Chief Sauer of the Village police was unable to establish whether there was any training his department received on the topic of child sexual abuse in 1989. Also, Martinez admitted that he has had no formal training in the investigation of child sexual abuse. Plaintiffs argue that, when combined with the Village's failure to look into the qualifications of the CAC staff, a jury could reasonably conclude that the Village recklessly disregarded the rights of those persons exposed to potential criminal charges as a result of this investigatory process. However, plaintiffs have failed to establish a policy of referring authority over the investigatory process to the Center staff.

Although plaintiffs have presented evidence that Village police are not specifically given training in the investigation of child sexual abuse, such a showing is not sufficient to withstand a motion for summary judgment on their failure to train claim. The standard of deliberate indifference is not satisfied by a showing of recklessness or even gross negligence in failing to train the officers. *Smith v. City of Joliet,* 965 F.2d 235, 237 (7th Cir.1992); *see also Cornfield,* 991 F.2d at 1327 (a municipal omission requires a high degree of culpability—a showing of actual or

constructive notice of the likelihood of a constitutional violation or a pattern of acquiescence or knowledge of a problem). Plaintiffs must establish evidence from which a reasonable jury could find that the Village deliberately or consciously disregarded plaintiffs' constitutional or statutory rights in failing to specifically train its officers in the investigation of child sexual abuse. *See id.* The Village has presented uncontroverted evidence that it has a policy of using the Center in child sexual abuse cases in an effort to establish a warm, nontraumatic environment to children in a location neutral to all agencies involved. Other than pointing to a lack of any specialized officer training in the investigation of child sexual abuse, plaintiffs establish no other instances that would put the Village on notice that officers had allowed the Center to take complete control of a child sexual abuse case. Neither do plaintiffs establish any expert evidence of the need for specialized training in investigation of child sexual abuse. Absent any evidence that the Village should have been on notice of the need for specialized training, a reasonable jury could not conclude that the need was so obvious and the inadequacy so likely to result in constitutional violation that the Village could be said to have been consciously indifferent. Therefore, summary judgment will be granted in favor of the Village on plaintiffs' failure to train claim.

### STATE CLAIM FOR MALICIOUS PROSECUTION

Since all of plaintiffs' federal claims have been dismissed prior to trial, this court declines to exercise jurisdiction over plaintiffs' remaining state claims for malicious prosecution and will dismiss them without prejudice. 28 U.S.C. § 1367(c)(3); *Midwest Grinding, Inc. v. Spitz,* 769 F.Supp. 1457, 1470 (N.D.Ill. 1991). *Cf. Wentzka v. Gellman,* 991 F.2d 423, 425 (7th Cir.1993).

IT IS THEREFORE ORDERED that defendants' motions for summary judgment [104, 108, 111, 114] are granted in part and denied in part. The Clerk of Court is directed to enter judgment in favor of defendants and against plaintiffs, dismissing plaintiffs'

federal causes of action with prejudice and dismissing plaintiffs' state law causes of action without prejudice.

Nancy WINTERS, Deborah Morris, and Betty Wadlington, individually and as representatives of all similarly situated individuals, Plaintiffs,

v.

Faye MOWERY, individually and in her official capacity as Marion County Clerk; the United States of America; and Marion County, Indiana, Defendants.

IP 91–919 C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Nov. 4, 1993.

Richard A. Waples, Indiana Civil Liberties Union, Stephen Laudig, Indianapolis, IN, for plaintiff.

Andrew P. Wirick, City–County Legal Division, Indianapolis, IN, for Faye Mowrey.

Winfield Ong, Indianapolis, IN, for U.S.

Patricia Polis McCrory, John D. Roop, Jr., Harrison & Moberly, Indianapolis, IN, for Marion County.

## ENTRY

BARKER, District Judge.

Plaintiffs move for partial summary judgment on the issue of Defendants' liability for payment of the interest accruing on court held spousal maintenance and child support payments. For the reasons set forth below, the Court enters full summary judgment on all the claims, finding in favor of plaintiffs and against defendants on the interest entitlement issues and in favor of defendant Mowery. The Court orders defendants to pay plaintiffs the interest that accumulated on the payments held by the Marion County Clerk dating back to the date this lawsuit was first filed [1] and dismisses plaintiffs' suit

---

has sought the assistance of the agency designated to administer Title IV-D of the federal Social Security Act, the court shall order that *the payment of such support money be made to the clerk of the circuit court of the county wherein the decree or order is entered.* (emphasis supplied).